MONADNOCK MILLS v. FUSHEY.

(Circuit Court of Appeals, First Circuit. July 5, 1915.)

No. 1109.

1. MASTER AND SERVANT ⬤⟿286—DUTY OF MASTER TO INSTRUCT—PERFORMANCE—QUESTION FOR JURY.

In an action against the employer by the administrator of a deceased servant, whether it was consistent with due regard for the servant's safety to permit him alone to remove the covers from certain kiers, with no instruction except such as was given him by the superintendent and another servant, held for the jury under the evidence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. ⬤⟿286.]

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. MASTER AND SERVANT ⬳270—INJURIES TO SERVANT—EVIDENCE.

Where a mill employé was scalded to death while removing the cover from a kier containing hot bleaching solution, in his administrator's action for the death, testimony by a witness, who had been employed at the mill to perform the same duties as the deceased servant from about 18 months before the accident until 3 or 4 weeks before it, as to what he observed during the time in regard to the clamps, safety valve, and pressure gauge belonging to the kier, found partially open immediately after the accident, was admissible.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 913–927, 932; Dec. Dig. ⬳270.]

3. MASTER AND SERVANT ⬳270—INJURIES TO SERVANT—EVIDENCE.

In an administrator's action for death of a mill servant, scalded to death while removing the cover from a kier containing hot bleaching solution, testimony of a former employé of the mill as to whether H., the servant who had instructed the decedent as to the operation of the kiers, was clear-headed and clear-minded, or otherwise, H. not being before the jury, his testimony being taken by deposition, was admissible.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 913–927, 932; Dec. Dig. ⬳270.]

4. WITNESSES ⬳268—CROSS-EXAMINATION.

In an administrator's action for death of a mill servant while removing the cover of a kier full of hot bleaching solution, where the defendant examined its superintendent as to instructions given by him and as to statements by the deceased servant after receiving the instructions, plaintiff's cross-examination of such superintendent as to whether, judging from his knowledge of the deceased servant and from his character, he would have followed instructions, had he understood them, was proper cross-examination.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 931–948, 959; Dec. Dig. ⬳268.]

In Error to the District Court of the United States for the District of New Hampshire; Edgar Aldrich, Judge.

Action by Henry E. Fushey, as administrator, against the Monadnock Mills. Judgment for plaintiff, and defendant brings error. Affirmed.

Henry N. Hurd, of Claremont, N. H. (William E. Kinney and Hurd & Kinney, all of Claremont, N. H., on the brief), for plaintiff in error.

Joseph Madden, of Keene, N. H., for defendant in error.

Before PUTNAM, DODGE, and BINGHAM, Circuit Judges.

DODGE, Circuit Judge. The defendant in error, hereinafter called plaintiff, has recovered judgment in the New Hampshire District Court against the plaintiff in error, hereinafter called defendant, for injuries sustained at some time during the early morning of April 6, 1913, in the defendant's mill at Claremont, N. H., by Paul Paulette, then a watchman in the defendant's employ. Paulette died from the injuries received April 13, 1913. The plaintiff sues as his administrator, for damages such as he might have recovered had he survived, and damages for his death, as provided by Pub. Laws N. H. c. 191, § 12. The suit is brought under the New Hampshire Employers' Liability and Workmen's Compensation Act (Laws 1911, c. 163). Although Paulette

and the defendant were both New Hampshire citizens, and although the plaintiff is administrator by appointment of a New Hampshire probate court, he is a citizen and resident of Vermont. The District Court overruled an objection to the jurisdiction; but this, though assigned as an error in the record, has not been insisted on as error here.

The sixth, seventh, and eighth assignments of error, based upon the contention that the evidence was insufficient for any verdict in the plaintiff's favor, are the assignments principally relied on by the defendant.

Paulette had been on duty alone in the mill during the night referred to, and was alone there at the time when his injuries were received. There was, therefore, no witness who saw the accident happen, and no statement by him before his death regarding the manner of its occurrence was before the jury.

As part of his duties he was expected, at or about 4 o'clock in the morning, to "blow off," or stop the operation of, four large vats, called "kiers," containing fabric undergoing a bleaching process effected by an alkali solution, caused to circulate through the fabric under the pressure of live steam introduced into the kier through a central pipe. Each kier was of sheet iron, and provided with a closely fitting, heavy iron cover over its top. While in operation each cover was held down by twelve screw clamps. To release these clamps, or any of them, while there was pressure within the kier, involved danger of injury from the hot bleaching solution, which was liable to be forced out of the kier, underneath the cover, so long as such pressure continued. The proper method was, after first shutting off the live steam and opening the safety valve until the gauges showed no pressure, to let cold water run into the kier for at least 10 or 15 minutes; and not until after all this had been done was all risk of having hot solution expelled from the kier upon release of the clamps at an end. The clamps were then to be unscrewed and the cover raised by a brake.

Paulette, according to the uncontradicted evidence, was burned and scalded by hot solution from the interior of a kier. After receiving his injuries, he succeeded in reaching his home, which was close to the mill. Until he got there, no one knew that he had been hurt. Two of the four kiers were thereupon found to have been properly blown off and filled with water. Another had not been touched. The remaining kier had one of the clamps which secured its cover on; the other 11 clamps were off and lying on the floor. A considerable quantity of the solution which it had contained was on the floor around it. The steam had been shut off from it, but there was no cold water running into it, when the kier was first examined after the accident. The fabric in the kier was steaming, but it had not been injured by heat, as would have been the case had the admission of cold water been delayed long enough after the steam was shut off and circulation of the bleaching solution thereby stopped.

Had there been nothing further in the evidence, the only reasonable conclusion might have been that Paulette released the clamps before the pressure within the kier had been sufficiently reduced, and had thus been the sole cause of his own injuries. The statute above referred

to, while providing that an employed workman should not be held to have assumed the risk of injury caused by any negligence on the part of his employer or of other employés, or by any defect or insufficiency, due to such negligence, in the condition of plant, ways, works, machinery, equipment or appliance, provided also against liability of the employer for—

"any injury to which it shall be made to appear by a preponderance of evidence that the negligence of the plaintiff contributed."

If Páulette, having been sufficiently instructed as to the danger, knowingly released the clamps without first taking the proper precautions, and thus contributed to his own injury, the statute did not permit him to recover.

But there was also evidence tending to charge the defendant with negligence such as might have caused Paulette's injuries without contributory negligence on his part. This evidence tended to show that there had been a failure to instruct him properly regarding the operation of the kiers, and the dangers incident thereto, before leaving him to operate them without assistance; also to show a defective condition of the clamps used to hold the cover down, or a defective condition of the safety valve and steam gauges, rendering the latter unreliable as an indicator of the amount of pressure in the kier. On each of the above points there was conflicting evidence, and as to neither of them are we able to hold that the only reasonable conclusion which the jury could have drawn from all the evidence before them must have been in the defendant's favor.

Paulette, it appeared, was nearly 73 years old, and had been in the defendant's employ less than 4 weeks before the accident. The instructions shown to have been given him in regard to the kiers had been given him for the most part by Hurley, another employé, whose duties were to run the kiers during the daytime and to open them on weekday mornings. The accident was on a Sunday morning, and it was only on Sunday mornings that Paulette was expected to open them by himself; Hurley being then off duty. Hurley's deposition, taken by the defendant, but offered in evidence by the plaintiff, described the instructions he had given Paulette. Hurley stayed with him in the mill every night for a week, but he does not appear to have had anything to do with the opening of the kiers until a Sunday morning, during which Hurley showed him how to take the covers off, afterward letting him take them off from one kier himself, watching him while he did it. According to Hurley, he made Paulette understand all the various steps of the operation and the dangers to be avoided therein, until Paulette said he could do it all right alone. Hurley's evidence left it doubtful whether the accident happened on the next following Sunday morning, or the next but one. The only other instructions shown to have been given were by McCusker, the defendant's superintendent, who testified that, both before and after Hurley's instructions, he had himself shown Paulette the valves and warned him not to remove the clamps until he had the cold water running in from 10 to 15 minutes. According to McCusker, Paulette had opened the kiers alone, without accident, on one Sunday morning before

that on which he was injured, and had expressed to McCusker, after having done so, confidence in his own ability to open them properly.

[1] Although Hurley and McCusker both testified that Paulette understood their instructions and was capable of following them by himself, it was a question for the jury, in view of all the evidence before them, some of it relating to Paulette's previous experience and general capacity, whether or not it was consistent with due regard for his safety to let him undertake alone an operation attended with dangers such as might have been found to have attended it, without instruction other than that described by these two witnesses. The defendant was not entitled to a ruling by the court that he had been adequately instructed, or that there was no evidence sufficient for finding that he had not been adequately instructed. This would have been true, had there been no evidence tending to show that the appliances above mentioned were unreliable; it is certainly no less true in view of that evidence.

Whether or not this accident was caused by negligence on the defendant's part, either in failure to give Paulette adequate instructions, or in failure to have the above appliances free from defect, or in both, and, if so, whether or not negligence on Paulette's part contributed, were questions which the jury had to determine, without any direct evidence as to the actual manner of occurrence of the accident, by a choice between possible divergent inferences from surrounding facts and circumstances. In this respect the case resembles the following previous cases before this court: Griffin v. Overman Wheel Co., 61 Fed. 568, 9 C. C. A. 542; Id., 67 Fed. 659, 14 C. C. A. 609; So. Pac. Co. v. De Valle Da Costa, 190 Fed. 689, 111 C. C. A. 417; Odell Mfg. Co. v. Tibbetts, 212 Fed. 652, 129 C. C. A. 188. In those cases, as here, the refusal to direct a verdict for the defendant, upon the ground that the evidence was insufficient to justify a verdict for the plaintiff, was assigned as error; but in neither case was the exception sustained. An examination of the evidence in the record leaves us unable to sustain it in the present case.

The remaining errors assigned relate to admissions of testimony against the defendant's objection.

[2] The witness Perkins, employed at the defendant's mill to perform the same duties as were afterward performed by Paulette, from a time about 18 months before the accident until 3 or 4 weeks before it, was permitted to state what he observed during that period in regard to the clamps, safety valve, and pressure gauge belonging to the kier found partially open, as above, immediately after the accident. We cannot say the court was wrong in refusing to exclude this as too remote in time. There was other evidence for the plaintiff tending to show that the condition of the appliances referred to, described by Perkins, continued until the accident.

[3] Perkins was also permitted, after stating that he had known Hurley for 20 years or more, to "describe Hurley's characteristics as to being clear-headed and clear-minded or otherwise." The jury did not see Hurley, or hear his testimony, which was brought before them only by deposition. We cannot say the court was wrong in allowing

what the witness had observed regarding his characteristics to be considered by the jury upon the question of the adequacy of the instructions given by him to Paulette according to his deposition.

[4] After McCusker, the witness above referred to, had been examined by the defendant, the plaintiff was permitted to ask him in cross-examination whether, judging from his knowledge of Paulette and from his character, Paulette would follow his instructions if he understood them. The defendant having examined McCusker regarding the instructions given by him, and regarding statements by Paulette after he had received those instructions, we are unable to hold that the inquiry objected to exceeded the limits of proper cross-examination.

The record discloses no grounds of objection, stated at the time, to the testimony admitted as stated in the two assignments of error last above considered. That objections for which no ground is so stated may be disregarded is a familiar rule in the federal courts. Penna. Co. v. Whitney, 169 Fed. 572, 95 C. C. A. 70; Robinson v. Van Hooser, 196 Fed. 620, 624, 116 C. C. A. 294; Penna. Co. v. Cole, 214 Fed. 948, 951, 131 C. C. A. 244.

The judgment of the District Court is affirmed, with interest, and the defendant in error recovers his costs of appeal.